UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALLEN BOBBITT and ROBERT
BUTLER, individually and on behalf
of those similarly situated,

        Plaintiffs,

v.                                                                      Case No.  8:11-cv-2855-T-24 MAP

BROADBAND INTERACTIVE, INC.,

        Defendant.

_____/

## **ORDER**

This cause comes before the Court on two sets of motions: (1) Defendant's Motion to

Decertify Conditionally Certified FLSA Class (Doc. No. 157), which Plaintiffs oppose (Doc. No.

165); and (2) the parties' cross-motions for summary judgment (Doc. No. 154, 155) and the

responses thereto (Doc. No. 160, 161).  As explained below, these motions are denied.

## **I.  Background**[1]

On December 28, 2011, named plaintiffs, Allen Bobbitt and Robert Butler, filed suit

against Defendant Broadband Interactive, Inc. ("BBI").  In their amended complaint, they allege

that they were mis-classified by BBI as independent contractors and assert minimum wage and

---

[1]The Court has read the entire transcripts of the following individuals and will refer to
such transcripts by the deponent's last name: John Nix, Jr. (Doc. No. 169), Robert Widner (Doc.
No. 170), William Clinton (Doc. No. 171), Robert Butler (Doc. No. 172), Kenneth Tinsley (Doc.
No. 173, 174), Francisco De La Cruz, as corporate representative for CIF Cable Enterprises,
LLC (Doc. No. 175, 181-2), Allen Bobbitt (Doc. No. 176), Andrew Briller (Doc. No. 177),
Vincent Sharkey (Doc. No. 178, 179), Joseph MacIntire (Doc. No. 180), Francisco De La Cruz
(Doc. No. 181), Karla Kraemer (Doc. No. 182, 183, 184), and James Peterson (Doc. No. 185).
Because this background is written for both the motion for decertification and the cross-motions
for summary judgment, the Court lays out the facts that appear undisputed and points out the
facts that are in dispute.

overtime claims under the Fair Labor Standards Act ("FLSA") and under Article X, Section 24 of Florida's Constitution.  (Doc. No. 5).  The Court has conditionally certified a collective class with respect to the FLSA claims.  (Doc. No. 32).  The conditionally certified class consists of Collections/Disconnect Technicians ("CD Techs") that performed work for BBI in Florida during the relevant three-year period (but prior to January 1, 2011[2]).  (Doc. No. 32).  Currently, in addition to the two named plaintiffs, twenty-two additional plaintiffs have opted-in.

### A.  Procedural Background

The Court bifurcated discovery, directing the parties to proceed first on liability discovery regarding the issue of whether, prior to 2011, the CD Techs were employees or independent contractors, with damages discovery to commence thereafter, if warranted.  (Doc. No. 88).  The parties selected seven plaintiffs as representative plaintiffs for the first phase of discovery: Bobbitt, Butler, Andrew Briller, Kenneth Tinsley, Joseph MacIntire, Vincent Sharkey, and Francisco De La Cruz ("Phase I Plaintiffs").  The Court directed the parties to file motions for summary judgment on the issue of whether, prior to 2011, the CD Techs were employees or independent contractors, and those motions are currently pending before the Court.  Also pending before the Court is BBI's motion for decertification.

### B.  Factual Background

BBI is a cable contracting company that provides cable installation, disconnection, and other services to telecommunications companies across the country.  During the relevant time period, BBI's primary business in Florida consisted of the collection of equipment and money and the disconnection of services for Bright House Networks ("BHN") in seven counties:

---

[2]On January 1, 2011, BBI re-classified all CD Techs as employees.

2

Hillsborough, Pasco, Pinellas, Polk, Manatee, Citrus, and Hernando.[3]  (Nix depo, p. 61).  The actual collection of money and the disconnection of services was performed by CD Techs.  The collection of equipment was first attempted by CD Techs at the time that they disconnected the BHN service, but if the equipment could not be collected at that time, the equipment was collected at a later time by CD Techs and by BBI's box collectors.  The work that the CD Techs performed was integral to BBI's contract with BHN.  (Nix depo, p. 99).  From 2007 through 2010, approximately 84% of BBI's annual gross revenues earned in Florida were derived from tasks performed by CD Techs, and approximately 62% of BBI's annual gross revenues earned in the United States were derived from tasks performed by CD Techs.  (Doc. No. 155-8, ¶ 3, 4).

In order to perform their work, CD Techs needed to have or purchase a vehicle, auto insurance, a ladder, tools, safety equipment, and a cell phone.  (Nix depo, p. 162-63).  BBI would stock tools that the CD Techs could buy directly from BBI at its offices and pay for via payroll deductions.  (Clinton depo, p. 286-87).  BHN supplied the materials needed to perform their job, such as red flags, fittings, terminators, silicone, tie wraps, traps, and cable.  (Widner depo, p. 300; Butler depo, p. 234).  Initially, BBI worked out of BHN's offices, but eventually, BBI leased office space in the six Florida counties in which it worked.[4]  (Nix depo, p. 152-53; Clinton depo, p. 289).  The BBI offices had desktop computers that the CD Techs could use to route their work.  (Nix depo, p. 311; De La Cruz depo, p. 77; Tinsley depo, p. 140; Butler depo, p. 359-60).

No experience or special skills were required in order to be hired as a CD Tech.[5]

---

[3]BBI referred to Citrus and Hernando counties collectively as "Lecanto."

[4]The office for Lecanto combined Citrus and Hernando counties.

[5]In 2010, BHN required, and as a result BBI required, that CD Techs have a Jones certificate.  (Nix depo, p. 262, 264; Widner depo, p. 293-94).

(Clinton depo, p. 244, 331; Nix depo, p. 260, 263; Doc. No. 155-5, ¶ 7; Doc. No. 155-7, ¶ 4; Butler depo, p. 95).  The CD Techs were trained in two to three days regarding how to perform their job by riding along with BBI supervisors or by riding along with veteran CD Techs.  (Nix depo, p. 194, 198-99, 204, 254; Clinton depo, p. 330-31; Widner depo, p. 263-64; Bobbitt depo, p. 306; Sharkey depo, p. 121).

Once they were hired, CD Techs were issued a Tech Number, which was required in order to be assigned work.  (Widner depo, p. 305).  In general, BHN would issue work orders to BBI supervisors, and then the BBI supervisors would assign between 25 and 40 of the BHN work orders to each CD Tech.[6]  (Nix depo, p. 72, 267, 270).

The parties dispute whether the CD Techs were required to show up at BBI's offices by a certain time each morning.  According to BBI, there was no set time to arrive.  (Nix depo, p. 66-67).  According to the CD Techs, they were required to arrive at BBI's offices by a set time each morning.  (MacIntire depo, p. 38-39; De La Cruz depo, p. 21-22; Sharkey depo, p. 83-85, 89, 162, 164, 168, 242-43, 280; Tinsley depo, p. 88-89; Briller depo, p. 152-53; Bobbitt depo, p. 211; Butler depo, p. 188-270; Kraemer depo, p. 217, 223-24, 322, 460).

Furthermore, the parties dispute whether there were consequences for not arriving at BBI's office on time in the morning.  BBI contends that it never disciplined the CD Techs in any manner for any reason, and thus, there was no discipline for being late.  (Nix depo, p. 55, 182; Clinton depo, p. 109-10).  However, the CD Techs contend that they were punished for being late, including given verbal warnings, being written up, or having their route affected in a negative way (given fewer work orders, a bad area, or no route at all).  (Peterson depo, p. 17-19;

---

[6]Sometimes BHN directly assigned work orders to specific CD Techs. (Nix depo, p. 270).

De La Cruz depo, p. 24-28, 33-34, 36-37, 39; Sharkey depo, p. 72-73, 90-93, 241-43, 275-77; Tinsley depo, p. 88-89, 180-83, 204-06, 209-10, 226; Briller depo, p. 155, 243; Kraemer depo, p. 226-28; Doc. No. 155-6, ¶ 6).  BBI contends that if it did give a CD Tech's route away because he arrived too late at BBI's office, BBI had to do so in order to ensure that the work was completed in a timely manner, as BHN sometimes put specific time-frames on the work orders. (Nix depo, p. 247, 270, 281; Clinton depo, p.105-108, 137, 199; Widner depo, p. 159, 318).

Generally, CD Techs picked up their work orders in the mornings Monday through Friday after they turned in any equipment and money that they had collected the previous day. (Clinton depo, p. 219-20; Widner depo, p. 159-60; Sharkey depo, p. 83-85, 89, 162, 164, 168, 242-43, 280; Tinsley depo, p. 85; Briller depo, p. 96).  BBI would not issue new work to a CD Tech until he had turned in all previous work orders.  (Nix depo, p. 256; Clinton depo, p. 190; Butler depo, p. 357).  BBI had the CD Techs turn their work orders in to BBI in a certain way—they needed to prepare a cover sheet that summarized the completed work orders, and during the time that the work orders were in paper format, they needed to separate the work orders into white, green, and yellow stacks.  (Clinton depo, p. 198, 214: Widner depo, p. 211-12, 272-74; Bobbitt depo, p. 280; Butler depo, p. 166; Kraemer depo, p. 467-68).  While BBI disputes that CD Techs were ever disciplined, the CD Techs contend that they were written up if they messed up their paperwork.  (Kraemer depo, p. 152-57; Butler depo, p. 299-300; Doc. No. 155-6, ¶ 14).

Sometimes BBI would hold meetings in the mornings to go over changes in the codes that the CD Techs were required to use in their paperwork, changes in their rates of pay, and changes to BHN's specifications that they were required to follow.  (Clinton depo, p. 41, 47;

Kraemer depo, p. 177-78).  BBI contends that the CD Techs were not required to attend these

meetings, but the CD Techs contend that the meetings were mandatory.  (Nix depo, p. 67;

Clinton depo, p. 60-61, 122; De La Cruz depo, p. 113; Butler depo, p. 379-80).

The work orders assigned to the CD Techs were generally grouped by BBI by zip code.

(Nix depo, p. 72; Peterson depo, p.15-16).  The CD Techs could not select the type or number of

work orders that BBI initially assigned to them.  (Nix depo. p. 73; Clinton depo, p. 102; Briller

depo, p. 150-51, 202; Bobbitt depo, p. 87; Butler depo, p. 385; MacIntire depo, p. 114-15;

Tinsley depo, p. 189).  According to the CD Techs, they were required to do the route that was

assigned to them and could not refuse any specific work order.  (Tinsley depo, p. 188-89;

Kraemer depo, p. 453-54; Doc. No. 155-6, ¶ 17).  The CD Techs could request to work in certain

areas, and BBI contends that it would try to accommodate such requests, but the location of the

work given by BHN dictated where BBI assigned the CD Techs.  (Nix depo, p. 63, 69, 71, 77-

78; Widner depo, p. 175-76, 317; Peterson depo, p.28).  If a CD Tech wanted additional work,

they could request it and be assigned equipment recovery.[7]  (Nix depo, p. 267).

If a CD Tech wanted to take a day off from work, BBI required the tech to give BBI

advance notice so that BBI would not assign them a route.  (Nix depo, p. 212; Clinton depo, p.

116; Widner depo, p. 198, 203; MacIntire depo, p. 102-03; Sharkey depo, p. 95- 239-40; Tinsley

depo, p. 186-88; Briller depo, p. 159-62, 164; Butler depo, p. 213, 266-68, 293-94, 301; Bobbitt

depo, p. 58-59).  BBI contends that the CD Techs were free to work or take off whenever they

wanted, but the CD Techs contend that they had to get BBI's permission to take a day off from

---

[7]The assigned equipment recovery consisted of attempting to recover equipment that
could not be recovered during the original disconnect.  (Nix depo, p. 267).

work and permission was not always granted.  (Butler depo, p. 267-68, 294, 301-02; Kraemer depo, p. 206, 290-92; Tinsley depo, p. 96-98, 187-88; Doc. No. 155-6, ¶ 18).

At times, there was also work available on Saturdays.  (Nix depo, p. 68; Clinton depo, p. 113-14; Widner depo, p. 193-197).  BBI contends that the CD Techs were never required to work on Saturdays.  (Clinton depo, p. 113-14).  However, some of the CD Techs contend that BBI required them to work on certain Saturdays when there were not enough CD Techs that volunteered to work. (De La Cruz depo, p. 44-45, 47-49, 108-09; Sharkey depo, p. 223-34, 263-65; Bobbitt depo, p. 66-69; Butler depo, p. 262-63, 351; Kraemer depo, p. 322, 339-42, 349; Widner depo, p. 193-197; Doc. No. 155-25).

After the work orders were assigned and distributed, if a CD Tech wanted to exchange a work order with another tech, one of the techs had to call BBI or BHN so that the Tech Number could be changed on the work order.  (Nix depo, p. 69-70, 275; Clinton depo, p. 134-35; Peterson depo, p. 29; Widner depo, p. 214-15; Sharkey depo, p. 103-04, 106-07, 250; Bobbitt depo, p. 88, 223-24).  According to BBI, the CD Techs were "encouraged" to complete all of the work assigned to them each day.  (Nix depo, p. 247; Widner depo, p. 101, 165-66, 168).  However, the CD Techs contend that they were required to complete all of their work orders each day, and some contend that they were given less work the next day as punishment for not completing their work and rolling it over to the next day.  (Bobbitt depo, p. 140, 218; Butler depo, p. 356; Sharkey depo, p. 138, 141-42; Tinsley depo, p. 188; Kraemer depo, p. 183, 234-36).  Additionally, the parties dispute whether BBI told the CD Techs that after they finished their route, they were required to go back to the houses again to collect any equipment that they

did not collect during their route.[8]  (Nix depo, p. 251-52; Widner depo, p. 101-02, 109-10; Butler depo, p. 357; Doc. No. 155-26).

The CD Techs, themselves, determined the order in which they completed the work orders assigned to them, with the caveat that they meet the time-frames, if any, given by BHN on the work orders.  (Briller depo, p. 207; Bobbitt depo, p. 81, 207-08).  BHN also issued specifications regarding how to perform the work, and BBI informed the CD Techs of BHN's specifications and required that the CD Techs comply with the specifications.[9]  (Nix depo, p.31-32, 67, 193-95, 211-12, 215, 285, 305; Clinton depo, p.41, 47, 147-48; Widner depo, p. 34, 91, 211, 228, 242; Butler depo, p. 165-66, 352, 170-71; Sharkey depo, p. 243; Briller depo, p. 256; Bobbitt depo, p. 147-49, 298; Kraemer depo, p. 466).  BBI performed quality control ("QC") checks to ensure that the CD Techs were actually performing their work and to ensure that their work was meeting BHN's specifications.  (Clinton depo, p. 138-43; 173-74; Widner depo, p. 31-33, 162, 176-77, 206, 210, 227, 237).

Initially, the work orders BBI gave to the CD Techs were in paper format, but BHN later

---

[8]Sometimes customers were not home when the CD Techs initially attempted to collect the equipment, and as such, the CD Techs contend that they were required to return to those customers' houses again at the end of their route to try to collect the equipment (as opposed to leaving the collection of such equipment to the box collectors).  This could cause the CD Techs to lose money, as they had to pay for the gas to return to these customers' houses and the customers might still not be home.

[9]For example, BHN required that when disconnecting service, the CD Tech "cut fittings and all green tags, red tag, terminate port and silicone," and therefore, BBI required CD Techs to do this.  (Nix depo, p. 253-55).  Additionally, BHN required that involuntary disconnects could only be performed between 8:00 a.m. and 8:00 p.m. (Clinton depo, p. 110-11; Widner depo, p. 177-79; Sharkey depo, p. 253).

determined that it wanted to go paperless and use the TechNet system.  (Nix depo, p. 331-32).

As a result, in 2010, BBI issued netbooks with the TechNet system to the CD Techs, and work

orders were distributed electronically.  (Nix depo, p. 137-38, 302; Clinton depo, p. 187, 294).

The TechNet system also gave BBI the ability to monitor the CD Techs in real-time and to see

what work orders were left to complete.  (Clinton depo, p. 186-88; Widner depo, p. 50-51, 270-

71; Peterson depo, p. 64-65; Butler depo, p. 386).

     While performing the work assigned to them, the CD Techs could call BBI if they

encountered a problem or needed help.  (Widner depo, p. 226; Briller depo, p. 269-70; Butler

depo, p. 284, De La Cruz depo, p. 98-99).  Additionally, sometimes CD Techs were required to

notify BBI when they completed a work order or at the end of the day to inform BBI of the work

that they did not complete.  (Nix depo, p. 166; Peterson p. 62-64; De La Cruz-corp depo, p. 45;

De La Cruz depo, p. 94; Sharkey depo, p. 126; Bobbitt depo, p. 220).  BBI told the CD Techs to

be available by phone between 8:00 a.m. and 8:00 p.m. so that BBI could contact them, if

necessary.  (Widner depo, p. 213; Sharkey depo, p. 143, 253).  The CD Techs were sometimes

called after they finished their work for the day and directed to do additional work.  (Sharkey

depo, p. 143-47, 151, 253; Bobbitt depo, p. 97; Butler depo, p. 284; De La Cruz depo, p. 57-66).

     BBI had certain requirements regarding the appearance of the CD Techs.  (Widner depo,

p. 268, 280, 284-85).  For example, CD Techs were required to wear a specific shirt that

identified them as contractors for BBI and BHN and to carry an identification badge.  (Clinton

depo, p. 89, 236, 315; Widner depo, p. 212, 264-65; MacIntire depo, p. 106; De La Cruz depo, p.

110-11; Sharkey depo, p. 261; Butler depo, p. 323-24, 365-66; Bobbitt depo, p. 283, 292).

Additionally, CD Techs were required to wear work boots, tie their hair back (if they had long

hair), and some were told that they could not wear shorts.  (Nix depo, p.199-200; Clinton depo,

p. 236-37, 240; Widner depo, p. 213, 267-68; Peterson depo, p. 53-54; De La Cruz depo, p. 110-

11; Butler depo, p. 166, 323-24, 365-66; De La Cruz-corp depo, p. 68; Kraemer depo, p. 178;

Sharkey depo, p. 261; Bobbitt depo, p. 297).  Furthermore, BBI required the CD Techs to put

magnets on their vehicles that identified them as contractors for BBI and BHN, and BBI told

them not to have bumper stickers or political signs on their vehicles.  (Clinton depo, p. 240-43;

Widner depo, p. 265-66, 289; MacIntire depo, p. 106; De La Cruz depo, p. 112; Sharkey depo, p.

262; Bobbitt depo, p. 293; Butler depo, p. 324-25, 367).

 BBI required the CD Techs to follow BBI's driver policy.  (Clinton depo, p. 257; Doc.

No. 155-24).  While working, CD Techs could not have any passengers in their vehicles that had

not undergone a background check by BBI.  (Clinton depo, p. 262-63; Sharkey depo, p. 121-22,

255; Briller depo, p. 241; Bobbitt depo, p. 129, 152-53; Kraemer depo, p. 272-73; De La Cruz-

corp depo, p. 15; De La Cruz depo, p. 117).  According to the CD Techs, BBI required that they

have auto insurance that exceeded the minimum limits required by Florida.  (De La Cruz depo, p.

124-28; Sharkey depo, p. 201-02, 204). While BBI disputes that it conducted truck inspections,

there is evidence that BBI conducted monthly inspections of the CD Techs' vehicles.  (Peterson

depo, p. 49-53; MacIntire depo, p. 118-19; De La Cruz depo, p. 111; Sharkey depo, p. 260;

Bobbitt depo, p. 214-15; Butler depo, p. 368-69; Kraemer depo, p. 288-89).

 BBI contends that the CD Techs could hire assistants to help them with their work, but

the CD Techs dispute this fact, arguing that BBI prohibited them from hiring assistants.  (De La

Cruz-corp depo, p. 15-17, 19-20, 23; De La Cruz depo, p. 89; Briller depo, p. 241; Bobbitt depo,

p. 129, 152,156-57; Butler depo, p. 147, 283, 378; Doc. No. 155-6, ¶ 19).  Additionally, BBI

contends that the CD Techs were not prohibited from engaging in outside work, but the CD

Techs contend that BBI prohibited them from doing work for other cable companies.  (De La

Cruz depo, p. 88-89); Sharkey depo, p. 124-25, 266; Tinsley depo, p. 185-86; Briller depo, p.

286, 289; Bobbitt depo, p. 153; Butler depo, p. 151-52, 176-81; Doc. No. 155-6, ¶ 19).  The only

evidence of side-work by the CD Techs is that two of them did limited landscaping and lawn

work.  (MacIntire depo, p. 10-11; De La Cruz depo, p. 88; Bobbitt depo, p. 161-62; Butler depo,

p. 186).

 The CD Techs were paid at a piece rate, and they had no say in the rates that BBI paid

them.  (Nix depo, p. 193; Clinton depo, p.123, 322; De La Cruz depo, p 114; Bobbitt depo, p.

184, 297; Butler depo, p. 247-48, 364).  BBI would unilaterally change the rates paid to the CD

Techs during their association with BBI.  Several of the CD Techs contend that BBI required

that they obtain workers' compensation coverage through BBI via a 7% deduction in their pay.

(Briller depo, p. 108, 112-13; Bobbitt depo, p. 130; Butler depo, p. 227-28, 291).  One CD Tech

formed his own LLC in order to avoid the 7% deduction by BBI.  (De La Cruz depo, p. 19; De

La Cruz-corp depo, p. 5).

 According to BBI, BBI did not ever discipline the CD Techs; however, the CD Techs

contend that they were disciplined for various infractions via verbal warnings, being written up,

or having their route affected in a negative way (given fewer work orders, a bad area, or no route

at all).[10]  (Peterson depo, p. 17-19; De La Cruz depo, p. 24-28, 33-34, 36-37, 39, 44-45, 47-49,

51; Sharkey depo, p. 72-73, 90-93, 108-12,127-28, 241-43, 275-77; Tinsley depo, p. 88-89, 96-

---

[10]The was some mention of back-charges in the various depositions, but it is unclear
whether the amount BBI back-charged a CD Tech was the same amount that BHN back-charged
BBI.  (Nix depo, p. 56, 208-09)

98, 176-83, 204-06, 209-10, 226; Briller depo, p. 155, 243; Nix depo, p. 55, 182; Clinton depo,

p. 271-72; Widner depo, p.122-24, 142, 145-47, 149-52, 359-60; MacIntire depo, p. 27-28, 33-

35; Butler depo, p. 357; Kraemer depo, p. 68; Doc. No. 155-6, ¶ 6-16; Bobbitt depo, p. 71).  BBI

contends that it would only terminate a CD Tech for theft (including billing for work not actually

performed), having a suspended license, or not having auto insurance.  (Nix depo, p. 196;

Clinton depo, p. 48, 84, 93, 144-45, 271; Widner depo, p. 117, 120, 134, 246-47).

Many of the CD Techs worked for BBI for many years.  (Clinton depo, p. 331).  The

Phase I Plaintiffs worked for BBI for an average of six years: Briller - nine years; Sharkey -

seven years; Tinsley and De La Cruz - six years; Bobbitt and Butler - five years; and MacIntire -

four years.

## II.  Motions for Summary Judgment

Both parties move for summary judgment on the employee versus independent contractor

issue.  However, as explained below, genuine issues of material fact exist that preclude a finding

of summary judgment on this issue.

In determining whether a person is an independent contractor or an employee, courts

apply the economic realities test in order to evaluate the alleged employee's economic

dependence on the alleged employer. See Freund v. Hi-Tech Satellite, Inc., 185 Fed. Appx. 782,

782-83 (11th Cir. 2006). In applying the economic realities test, courts consider the following

factors, none of which are dispositive: "(1) the nature and degree of the alleged employer's

control as to the manner in which the work is to be performed; (2) the alleged employee's

opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's

investment in equipment or materials required for his task, or his employment of workers; (4)

whether the service rendered requires a special skill; (5) the degree of permanency and duration

of the working relationship; [and] (6) the extent to which the service rendered is an integral part

of the alleged employer's business." Id. at 783 (citation omitted).  Furthermore, as explained by

the Eleventh Circuit:

> While these factors serve as guides, the overarching focus of the
> inquiry is economic dependence: No one of these considerations can
> become the final determinant, nor can the collective answers to all of
> the inquiries produce a resolution which submerges consideration of
> the dominant factor—economic dependence. The . . . tests are
> aids—tools to be used to gauge the degree of dependence of alleged
> employees on the business with which they are connected. It is
> *dependence* that indicates employee status. Each test must be applied
> with that ultimate notion in mind. More importantly, the final and
> determinative question must be whether the total of the testing
> establishes the personnel are so dependent upon the business with
> which they are connected that they come within the protection of
> FLSA or are sufficiently independent to lie outside its ambit.
> Ultimately, in considering economic dependence, the court focuses
> on whether an individual is in business for himself or is dependent
> upon finding employment in the business of others.

Scantland v. Jeffry Knight, Inc., 721 F.3d 1308, 1312 (11th Cir. 2013)(quotation marks and

citations omitted).  Thus, in considering the factors set forth above, the Court "view[s] the

subsidiary facts relevant to each factor through the lens of 'economic dependence' and whether

they are more analogous to the 'usual path' of an employee or an independent contractor."  Id.

**A.  Scantland v. Jeffry Knight, Inc.**

In Scantland v. Jeffry Knight, Inc., the Eleventh Circuit recently applied the economic

realities test to cable technicians in a case that is very factually similar to Plaintiffs' version of

the facts in the instant case.  In Scantland, the plaintiffs worked for the defendant, which was an

installation and repair contractor for Bright House Networks in Florida.  See id. at 1310.  The

defendant company moved for summary judgment, arguing that the plaintiff technicians were

independent contractors, as opposed to employees, and the district court granted the defendant's motion.  See id. at 1310.  The Eleventh Circuit reversed, concluding that when viewing the evidence in the light most favorable to the plaintiffs, they had shown that four of the six factors weighed strongly in favor of employee status.  See id. at 1319.

In analyzing the control factor, the appellate court stated that "'[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity.'"  Id. at 1313 (quoting Usery v. Pilgrim Equipment Co., Inc., 527 F.2d 1308, 1312-13 (5th Cir. 1976)).  The appellate court concluded that the plaintiffs had shown that the defendant exercised significant control over them based on the following: the technicians were required to report to the defendant's facilities at a certain time each morning; the technicians had to turn in the equipment they collected and completed work orders, and then they received a route consisting of new work orders for the day; the technicians could not reject a route or a work order within their route without the threat of termination or being refused work the following days; the technicians were required to attend meetings; the technicians could be assigned additional jobs and could be called back to jobs after they had completed them; the technicians could not work for other companies; the technicians were subject to meaningful supervision and monitoring, quality control checks, and they routinely communicated with the defendant during the day; the defendant could levy un-contestable flat-rate chargebacks against the technicians for various infractions; and the technicians had to inform their supervisors in advance that they wanted to take time off, and they were sometimes required to work six or seven days per week.  See id. at 1313-15.  As such, the appellate court stated:

14

> In sum, [the defendant] controlled what jobs plaintiffs did, how much they were paid, how many hours they worked, how many days they worked, their daily work schedule, whether they could work for others, whether they could earn additional income from customers, and closely monitored the quality of their work. Plaintiffs could not bid for jobs or negotiate the prices for jobs. Their ability to hire and manage others was illusory. This alleged control strongly suggests that the plaintiffs were economically dependent upon [the defendant].

Id. at 1315.

The defendant objected to the plaintiff's characterization of control, arguing that the specifications that the technicians were required to follow and the quality control measures that the defendant undertook were consistent with the duties required of independent contractors. See id. The appellate court rejected this argument, stating:

> We agree that meeting clients' specifications and keeping clients informed of job progress is consistent with the "usual path" of an independent contractor.  But the specific facts alleged by plaintiffs diverge from the "usual path."  Plaintiffs testified that the manner of their work was tightly regulated by [the defendant] and left them with no discretion in how to approach a particular job. . . . [Additionally, the defendant's] quality control measures are just one of numerous indicia of control that together strongly suggest an employee-employer relationship.

Id.

The defendant also argued that its quality control measures and regulation of the technicians' schedules were simply the nature of the business and were not relevant evidence of control.  See id. at 1316.  The appellate court rejected this argument, stating:

> The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control. Business needs cannot immunize employers from the FLSA's requirements. If the nature of a business requires a company to exert control over workers to the extent that [the defendant] has allegedly done, then that company must hire employees, not independent contractors.

15

Id.  The appellate court concluded that after construing the evidence in the light most favorable to the plaintiffs, the control factor pointed strongly toward employee status.  See id.

Next, the appellate court considered the technicians' opportunity for profit or loss depending on their managerial skill.  See id.  The appellate court concluded that, after construing the evidence in the light most favorable to the technicians, their "opportunity for profit or loss depended more upon [the defendant's] provision of work orders and technicians' own technical skill and efficiency than their managerial skill."  Id.  The appellate court pointed out that "[a]n individual's ability to earn more by being more technically proficient is unrelated to an individual's ability to earn or lose profit via his managerial skill, and it does not indicate that he operates his own business."  Id. at 1317.  Additionally, the appellate court noted that the plaintiffs could not work for other companies, nor could they hire employees to assist them with their work for the defendant.  See id.  The appellate court concluded that after construing the evidence in the light most favorable to the plaintiffs, this factor pointed strongly toward employee status.  See id.

Next, the appellate court considered the technicians' investment in equipment or materials required for the performance of their work.  The appellate court found that this factor weighed slightly in favor of independent contractor status, stating:

> [The defendant] provides, via [Bright House Networks], the hardware that is actually installed in customers' homes and businesses . . . . Technicians are required to have vehicles, auto insurance, tools and safety equipment, and commercial general liability insurance. However, in light of the fact that most technicians will already own a vehicle suitable for the work and that many technicians purchased specialty tools from [the  defendant] directly via payroll withholdings, there seems to be little need for significant independent capital and very little difference from an employee's wages being increased in order to pay for tools and equipment. . . . In sum, these

16

> expenditures seem to detract little from the worker's economic
> dependence on [the defendant], which is the lens through which we
> evaluate each of the several factors. Thus, to the extent that this factor
> weighs in favor of independent contractor status, the weight in that
> direction is minimal.

Id. at 1317-18.

Next, the appellate court considered whether the service rendered by the technicians required a special skill.  See id. at 1318.  The appellate court noted that the plaintiffs conceded in their complaint that they were skilled workers.  See id. at n.13.  However, the court noted that most technicians were inexperienced when they were hired, and the defendant provided them with training that equipped them with the necessary skills.  Thus, the court concluded that the technicians were dependent on the defendant to equip them with their skills, and thereafter, the skills they attained gave them some economic independence, because they had marketable skills. See id.  Therefore, the court concluded that this factor weighed slightly in favor of independent contractor status.  See id.

Next, the appellate court considered the degree of permanency and duration of the working relationship.  See id.  The court found that there was evidence of long duration and permanency, because the named plaintiffs worked for the defendant for an average of more than five years, and their contracts automatically renewed for year terms and required 30 days notice for termination.  See id.  Furthermore, after construing the evidence in the light most favorable to the plaintiffs, the evidence suggested that the plaintiffs could not work for other companies, and this exclusivity was a relevant consideration.  See id. at 1319.  Thus, the court concluded that this factor weighed strongly towards employee status.  See id.

Next, the appellate court considered the extent to which the service rendered by the

technicians was an integral part of the defendant's business.  See id.  In concluding that this

factor weighed strongly toward employee status, the court stated:

> Approximately two-thirds of [the defendant's] business consists of . . . [work] it performs for [Bright House Networks]. [The defendant] relies on approximately five hundred technicians to perform installations and repairs . . . [for Bright House Networks]. [The defendant's] website described its Installation Services department as the "backbone" of its business.  The integral role played by technicians in [the defendant's] business shows that the arrangement follows more closely that of an employer-employee relationship than an independent contractor dynamic. If [the defendant] had truly outsourced such a large portion of its business, as would be true if plaintiffs were independent contractors, then the company would retain far less control over the business. However, because of [the defendant's] concern with the quality of the services it provides through this arrangement, it does, as one might expect, control the relationship in much the same way a company would control its employees. The technicians' integral part in [the defendant's] business follows the "usual path of an employee."

Id. at 1319.

As a result of its analysis, the appellate court concluded that after viewing the evidence in

the light most favorable to the plaintiffs, there was a genuine issue of material fact regarding

whether they were employees.  See id.  Specifically, the appellate court stated:

> When all the facts are viewed in the light most favorable to the plaintiffs and all reasonable inferences are drawn in their favor, four of the six factors weigh strongly in favor of employee status. The two factors that do not—investment and special skill—weigh only very slightly toward independent contractor status. Neither contributes in any significant manner to the workers' economic independence or to distinguishing the workers from "the usual path of an employee." Thus, we conclude that, viewing the facts most favorably toward plaintiffs and with all justifiable inferences drawn in their favor, plaintiffs were "employees"—not "independent contractors"—under the FLSA. Because there are genuine issues of material fact, and because plaintiffs were "employees" if all reasonable factual inferences are found in plaintiffs' favor, the district court erred in granting summary judgment to [the defendant].

18

Id.

### B.  Applying Scantland to the Instant Case

The facts of the instant case, as set forth by Plaintiffs, track the facts set forth by the

plaintiffs in Scantland.  BBI, however, disputes the facts set forth by Plaintiffs.  Given that

genuine issues of material fact exist, summary judgment is not warranted for either party.

However, the Court concludes that with respect to the sixth factor—whether the service

rendered by the CD Techs was an integral part of BBI's business—even after construing the

evidence in the light most favorable to BBI, this factor weighs strongly in favor of employee

status.  BBI's witness, John Nix, Jr., who was the manager of Pasco and Pinellas counties during

the relevant time and is currently the general manager of Florida, testified during his deposition

that the work that the CD Techs performed was integral to BBI's contract with BHN.  (Nix depo,

p. 99).  Furthermore, from 2007 through 2010, approximately 84% of BBI's annual gross

revenues earned in Florida were derived from tasks performed by CD Techs, and approximately

62% of BBI's annual gross revenues earned in the United States were derived from tasks

performed by CD Techs.  (Doc. No. 155-8, ¶ 3, 4).

The Court notes that BBI argues that no one CD Tech was essential to BBI's operations

and the workload of any CD Tech could easily be shifted to another tech.  However, that is not

the relevant test.  Instead, based on Scantland, this Court concludes that the evidence in this case,

considered in the light most favorable to BBI, shows that the services performed by the CD

Techs were an integral part of BBI's business and strongly points towards employee status.

However, because genuine issues of material fact exist regarding the other five factors, the

Court's conclusion regarding the sixth factor is not dispositive of the ultimate issue—whether

Plaintiffs were employees or independent contractors.

The Court notes that BBI argues that the Court should consider the fact that Plaintiffs classified themselves as independent contractors on their taxes and deducted business expenses each year.  However, for the purposes of trial on the issue of whether Plaintiffs were employees or independent contractors, how they characterized themselves for tax purposes is not a relevant consideration under the facts of this case.[11]  Plaintiffs testified in their depositions that they either had a tax preparer prepare their taxes or they used a tax preparation program that prompted them to fill out their taxes in a certain way based on the fact that they received 1099s from BBI.  As such, the Court will consider the economic realities of Plaintiffs' relationship with BBI, not whether they correctly interpreted and complied with the tax code.  See Demers v. Adams Homes of Northwest Fla., Inc., 2007 WL 3333440, at *5 (M.D. Fla. Nov. 7, 2007).

### III.  Motion for Decertification

The FLSA allows similarly situated employees to proceed in a collective action.  29 U.S.C. § 216.  In May of 2012, this Court conditionally certified a collective class of CD Techs that were classified as independent contractors and performed work for BBI in Florida during the relevant three-year period.  BBI moves to decertify the conditionally certified collective class, arguing that the CD Techs are not similarly situated with respect to their relationship with BBI (i.e., whether they were employees or independent contractors).

Plaintiffs have the burden of establishing that they are sufficiently similarly situated, and

---

[11]The Court notes, however, that the actual business expenses incurred by Plaintiffs (which may be reflected on the tax returns) are relevant to the analysis of whether Plaintiffs were employees or independent contractors, because such expenses relate to the economic realities factor regarding their investment in equipment or materials required for their task.

this analysis is less lenient than that which occurred during the conditional certification stage.

See Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1261 (11th Cir. 2008).  In making this

determination, the Court considers the following factors: (1) the disparate factual and

employment settings of the individual plaintiffs; (2) the various defenses available to BBI that

appear to be individual to each plaintiff; and (3) fairness and procedural considerations.  See id.

(citations omitted).  The Eleventh Circuit has not specified how much less lenient this stage of

review is, but it has stated that "logically the more material distinctions revealed by the evidence,

the more likely the district court is to decertify the collective action."  Anderson v. Cagle's, Inc.,

488 F.3d 945, 953 (11th Cir. 2007).  Furthermore, the Eleventh Circuit has noted:

> [A]lthough the FLSA does not require potential class members to
> hold identical positions, the similarities necessary to maintain a
> collective action under § 216(b) must extend "beyond the mere facts
> of job duties and pay provisions."  Otherwise, "it is doubtful that
> § 216(b) would further the interests of judicial economy, and it would
> undoubtedly present a ready opportunity for abuse."

Id. (internal citations omitted).  "[U]ltimately, whether a collective action is appropriate depends

largely on the factual question of whether the plaintiff employees are similarly situated to one

another."  Morgan, 551 F.3d at 1262.  As explained below, the Court concludes that Plaintiffs

are sufficiently similarly situated such that their FLSA claims could be tried fairly as a collective

action.

## A.  Disparate Factual and Employment Settings

BBI argues that material distinctions exist regarding: (1) the amount of input CD Techs

had regarding their route, (2) the CD Techs' ability to switch work orders with each other, (3)

the alleged dress code, (4) back-charges, (5) supervision, (6) schedules, (7) instruction given to

CD Techs regarding how to perform their duties, (8) opportunity for profit and loss, (9)

21

investment in equipment, (10) special skills, (11) permanency of the working relationship, and (12) the extent to which the CD Techs were integral to BBI.  Accordingly, the Court will address each issue identified above.

### 1.  Input Regarding Route

BBI first argues that material distinctions exist regarding the amount of input CD Techs have regarding their route.  Specifically, BBI contends that MacIntire testified that he could request a route close to his home, while Butler had to accept whatever route was assigned to him. (MacIntire depo, p. 98-99; Butler depo, p. 385).  However, the fact that MacIntire could *request* a route near his home is not evidence that he was always *given* a route near his home, nor does it indicate whether MacIntire ended up accepting whatever route was ultimately given to him. Furthermore, there is other evidence in the record that the CD Techs could request to work in certain areas, and BBI would try to accommodate such requests, but the location of the work given by BHN dictated where BBI assigned the CD Techs.  (Nix depo, p. 63, 69, 71, 77-78; Widner depo, p. 175-76, 317; Peterson depo, p.28; Briller depo, p. 204).  Thus, the alleged distinction between Butler and MacIntire's testimony is not material.

### 2.  Switching Work Orders

Next, BBI argues that material distinctions exist regarding the CD Techs' ability to switch work orders with each other.  Specifically, Bobbitt, Butler, and Sharkey testified that they could exchange their work orders with other CD Techs as long as they notified BBI of the switch, and this is consistent with the testimony from BBI.  (Bobbitt depo, p. 87-89; Butler depo, p. 282; Sharkey depo, p. 248-51; Nix depo, p. 69-70, 275; Clinton depo, p. 134-35; Peterson depo, p. 29; Widner depo, p. 214-15).  However, BBI points out that De La Cruz testified that he

was not allowed to switch work orders and that MacIntire gave somewhat conflicting testimony

regarding the switching of work orders.  (De La Cruz depo, p. 96-97; MacIntire depo, p. 46-47).

Given the overwhelming testimony regarding the switching of work orders, the Court finds that

the minor variance caused by De La Cruz and MacIntire's testimony is not significant.

### 3.  Dress Code

Next, BBI argues that material distinctions exist regarding the alleged dress code.

Plaintiffs testified that they had to wear a shirt that identified them as a contractor for BHN and

BBI, pants, boots, and an identification badge.  (Bobbitt depo, p. 231-32; Briller depo, p. 232-35;

MacIntire depo, p. 106; De La Cruz - corp depo, p. 66-68; Sharkey depo, p. 260-62; Butler depo,

p. 263-64, 323-24, 365).  BBI points out that some Plaintiffs described the shirts differently;

however, they all stated that BBI required them to wear specific shirts.  Additionally, BBI points

out that some Plaintiffs said that they could wear shorts and others said that they could not wear

shorts; however, this is not a significant distinction.

### 4.  Back-Charges

Next, BBI argues that material distinctions exist regarding the enforcement of back-

charges, wherein CD Techs would be charged for failing to perform their work up to BHN's

specifications.  The parties do not dispute that BBI could issue a back-charge against a CD

Tech's pay, and there is evidence that the amount of the back-charge was $100.  (Nix depo, p.

56, 208-09; MacIntire depo, p. 92; Bobbitt depo, p. 182, 299-300; Butler depo, p. 245, 376; and

Kraemer depo, p. 367).  However, there is no specific testimony regarding whether the amount

back-charged to the CD Techs was the same amount that BHN back-charged BBI.  Without such

information, the Court cannot determine whether the back-charges were a method of

punishment, and as such, back-charges will be given very little weight when determining

employment status.

### 5.  Supervision

Next, BBI argues that material distinctions exist regarding BBI's supervision of the CD

Techs.  BBI mainly focuses on the amount of communication between the CD Techs and BBI,

pointing out minor inconsistencies.  The Court, however, finds the evidence to be consistent, for

the most part, regarding the amount of communication between CD Techs and BBI.

While performing the work assigned to them, the CD Techs could call BBI if they

encountered a problem or needed help.  (Widner depo, p. 226; Briller depo, p. 269-70; Butler

depo, p. 284, De La Cruz depo, p. 98-99).  Additionally, sometimes CD Techs were required to

notify BBI when they completed a work order or at the end of the day to inform BBI of the work

that they did not complete.  (Nix depo, p. 166; Peterson p. 62-64; De La Cruz-corp depo, p. 45;

De La Cruz depo, p. 94; Sharkey depo, p. 126; Bobbitt depo, p. 220).  BBI told the CD Techs to

be available by phone between 8:00 a.m. and 8:00 p.m. so that BBI could contact them, if

necessary.  (Widner depo, p. 213; Sharkey depo, p. 143, 253).  The CD Techs were sometimes

called after they finished their work for the day and directed to do additional work.  (Sharkey

depo, p. 143-47, 151, 253; Bobbitt depo, p. 97; Butler depo, p. 284; De La Cruz depo, p. 57-66).

Thus, the evidence was consistent that communication between BBI and the CD Techs occurred

periodically throughout the day.

Next, BBI argues that there are material distinctions in the testimony regarding the level

of attention paid to inspecting the CD Techs' vehicles.  While their testimony may have differed

as to the exact level of attention paid to their vehicles, there is an abundance of testimony that

24

BBI conducted monthly inspections of the CD Techs' vehicles.  (Peterson depo, p. 49-53;

MacIntire depo, p. 118-19; De La Cruz depo, p. 111; Sharkey depo, p. 260; Bobbitt depo, p. 214-

15; Butler depo, p. 368-69; Kraemer depo, p. 288-89).  Furthermore, the testimony was

consistent that the CD Techs were required to have magnets on their vehicles to identify them as

contractors for BHN and BBI.   (Clinton depo, p. 240-43; Widner depo, p. 265-66, 289;

MacIntire depo, p. 106; De La Cruz depo, p. 112; Sharkey depo, p, 262; Bobbitt depo, p. 293).

### 6.  Schedules

Next, BBI argues that material distinctions exist regarding the CD Techs' schedules.

First, BBI argues that there are material distinctions among the CD Techs' schedules and their

ability to take off of work.  The Court rejects this argument, as the evidence was consistent that

CD Techs were supposed to provide advance notice to BBI prior to taking off work, because

they all were generally expected to work Monday through Friday.[12] (Nix depo, p. 212; Clinton

depo, p. 116; Widner depo, p. 198, 203; MacIntire depo, p. 102-03; Sharkey depo, p. 95, 239-40;

Tinsley depo, p. 186-87; Briller depo, p. 159-62, 164; Bobbitt depo, p. 54-55, 58-59, 202).

Furthermore, the CD Techs consistently testified that BBI told them what time they were

supposed to be at BBI's office in the morning.  (MacIntire depo, p. 38-39; De La Cruz depo, p.

21-22; Sharkey depo, p. 83-85, 89, 162, 164, 168, 242-43, 280; Tinsley depo, p. 88-89; Briller

depo, p. 152-53; Bobbitt depo, p. 211).

Additionally, BBI points out that the testimony varied regarding whether working on

---

[12]The Court deduces that BBI expected the CD Techs to work Monday through Friday, since the testimony was consistent that they were supposed to give BBI advance notice if they were going to take a day off.

Saturdays was mandatory.  However, the fact that some of the CD Techs stated that they were not required to work on Saturdays may have been due to there being enough volunteers to work on Saturdays, that it was not necessary for BBI to require those CD Techs to work.

### 7.  Instruction

Next, BBI argues that material distinctions exist regarding the instruction given to CD Techs regarding how to perform their duties.  The Court rejects this argument, as the CD Techs' testimony was consistent that BBI gave them certain specifications, allegedly from BHN, that dictated how to perform their work.

### 8.  Opportunity for Profit and Loss

Next, BBI argues that material distinctions exist regarding the opportunity for profit and loss.  The Court rejects this argument.

One of the factors this Court considers when determining employment status is "the alleged employee's opportunity for profit or loss *depending upon his managerial skill*." Scantland, 721 F.3d at 1316 (emphasis added).  The evidence in this case is consistent that the CD Techs' opportunity for profit or loss depended more on BBI's provision of work orders and the techs' experience and efficiency than on their *managerial* skills.  Plaintiffs consistently testified that they had no input in the work orders initially assigned to them, they were not allowed to hire assistants, and they were not allowed to work for other cable companies.  Thus, Plaintiffs consistently testified regarding the lack of managerial discretion that they had.

Additionally, BBI points out that two opt-in Plaintiffs (De La Cruz and Keith Hamm) performed services for BBI through their own corporations.  (Doc. No. 158, ¶ 2).  The Court

does not have any evidence regarding the operation of Hamm's corporation, but De La Cruz testified that he formed his corporation solely to avoid having 7% deducted from his pay for workers' compensation, and BBI was De La Cruz's corporation's only customer.  (De La Cruz-corp depo, p. 5, 14).  Thus, the fact that De La Cruz performed services for BBI through a corporation does not prevent his relationship with BBI from being similarly situated with the other plaintiffs.

### 9.  Investment in Equipment

Next, BBI argues that material distinctions exist regarding the CD Techs' investment in equipment.  While the dollar amounts varied, the items they invested in were consistent—the uniform shirt, work boots, a vehicle, a ladder, tools, cell phone, possibly a computer, and safety equipment.

### 10.  Special Skills

Next, BBI argues that material distinctions exist regarding the CD Techs' special skills.  While it is true that the CD Techs' initial skill levels may be different, that has little bearing on the issue at hand—whether the work performed by the CD Techs "requires a special skill." Scantland, 721 F.3d at 1318.  The evidence is consistent that no actual skills were required to be hired and that all skills could be learned during the few days of training.   (Clinton depo, p. 244, 331; Nix depo, p. 260, 263; Doc. No. 155-5, ¶ 7; Doc. No. 155-7, ¶ 4; Nix depo, p. 194, 198-99, 204, 254; Clinton depo, p. 330-31; Widner depo, p. 263-64; Bobbitt depo, p. 306; Sharkey depo, p. 121).

## 11.  Permanency

Next, BBI argues that material distinctions exist regarding the permanency of the working relationship between the CD Techs and BBI.  Specifically, BBI points out that there are distinctions in the exclusivity and duration of the CD Techs' relationship with BBI.  With regard to exclusivity, MacIntire did some landscaping work on the side for friends and family. (MacIntire depo, p. 8-11).  However, MacIntire did not state whether he could perform work for other cable companies, and five other CD Techs stated that they were told that they were not allowed to do work for other cable companies.  (De La Cruz depo, p. 88-89; Sharkey depo, p. 124-25, 266; Tinsley depo, p. 185-86;[13] Bobbitt depo, p. 153; Butler depo, p. 151-52; 176-81). Thus, the CD Techs' testimony appears to be consistent regarding exclusivity.

With regard to duration, the Phase I Plaintiffs worked for BBI for several years.  BBI points out that it has identified three opt-in plaintiffs that worked for BBI for three to ten weeks. While there is variation in the actual duration, the Court concludes that this variation does not prevent a finding that the CD Techs were similarly situated.

## 12.  Extent to Which CD Techs were Integral to BBI

Next, BBI argues that material distinctions exist regarding the extent to which the CD Techs were integral to BBI.  The Court rejects this argument.

One of the factors this Court considers when determining employment status is "the

---

[13]Tinsley did state in his deposition that he worked for another cable company (Cable Link) in the same year that he worked for BBI.  (Tinsley depo, p. 60).  However, he clarified in his answers to interrogatories that he worked for Cable Link prior to working for BBI.  (Doc. No. 159-12, p. 6).

extent to which the service rendered [by the CD Techs] is an integral part of" BBI's business. Scantland, 721 F.3d at 1319.  BBI's witness, John Nix, Jr., who was the manager of Pasco and Pinellas counties during the relevant time and is currently the general manager of Florida, testified during his deposition that the work that the CD Techs performed was integral to BBI's contract with BHN.  (Nix depo, p. 99).  Furthermore, from 2007 through 2010, approximately 84% of BBI's annual gross revenues earned in Florida were derived from tasks performed by CD Techs, and approximately 62% of BBI's annual gross revenues earned in the United States were derived from tasks performed by CD Techs.  (Doc. No. 155-8, ¶ 3, 4).

**B.  BBI's Defenses**

Next, BBI argues that individualized defenses preclude collective treatment. Specifically, BBI points out that it has asserted individualized defenses regarding the statute of limitations, who qualifies as a member of the class, and the economic realities of each CD Techs' economic dependence on BBI.  The Court has already addressed the appropriateness of a collective action with regard to BBI's defense of the economic realities of each CD Techs' economic dependence on BBI (above).

With regard to the statute of limitations, BBI argues that at least two opt-in plaintiffs are barred by the statute of limitations.  This does not prevent collective treatment, as BBI could simply file a motion or present evidence at trial regarding this straightforward defense.

Next, BBI argues that one of the opt-in plaintiffs was not a CD Tech.  Again, this does not prevent collective treatment, as BBI could simply file a motion or present evidence at trial regarding this straightforward defense.

Finally, BBI argues that common evidence will not be sufficient to show whether Plaintiffs worked enough hours to be entitled to overtime pay.  Instead, BBI argues that individualized evidence will be required regarding the number of hours worked by each Plaintiff. While the Court agrees that the number of hours worked and extent of overtime damages owed to Plaintiffs, if any, must be addressed on an individualized basis, that is not the only issue in this case.  The two main issues in this case are liability (including whether the CD Techs are employees) and damages.  Common evidence can be used for the liability phase.  The fact that common evidence, by itself, will not be sufficient for the damages phase (if liability is proven) does not undermine the judicial economy that can be achieved from this case proceeding as a collective action.

### C.  Fairness and Procedural Considerations

"Addressing whether Plaintiffs' claims could be tried fairly as a collective action also requires looking to the purposes of § 216(b) actions under the FLSA: (1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct."  Morgan, 551 F.3d at 1264 (citation omitted). The Court is mindful "that the FLSA is a remedial statute that should be liberally construed." Id. at 1265 (citation omitted).

Upon consideration, the Court finds that the CD Techs are sufficiently similarly situated such that their FLSA claims could be tried fairly as a collective action. This case consists of only twenty-four plaintiffs that worked in six different offices for BBI in Florida.  As previously stated, judicial economy can be achieved from this case proceeding as a collective action, as common evidence exists regarding the issue of whether the CD Techs were employees.

Furthermore, the Court is cognizant of the need for individualized evidence regarding Plaintiffs'

damages, if any, but such evidence can be presented while the case proceeds as a collective

action.  Accordingly, the Court denies BBI's motion for decertification.

## IV.  Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1)     Defendant's Motion for Summary Judgment (Doc. No. 154) is **DENIED.**

(2)     Plaintiffs' Motion for Summary Judgment (Doc. No. 155) is **DENIED.**

(3)     Defendant's Motion to Decertify Conditionally Certified FLSA Class (Doc. No.

157) is **DENIED**.

(4)     The Court will hold a status conference in this case on ***November 6, 2013 at 9:00***

***a.m.*** in Courtroom 17.

(5)     The Court will address the due date for Plaintiffs' answers to the Court's

interrogatories during the status conference.

(6)     Plaintiffs are directed to file a notice by ***October 28, 2013*** that lists the names of

the opt-in plaintiffs and identifies the counties in which they worked.

**DONE AND ORDERED** at Tampa, Florida, this 21st day of October, 2013.

SUSAN C. BUCKLEW
United States District Judge

Copies to: Counsel of Record